UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AURELIUS CAPITAL PARTNERS, LP and AURELIUS CAPITAL MASTER, LTD v. THE REPUBLIC OF ARGENTINA | 07 Civ. 2715 (TPG) |
| AURELIUS CAPITAL PARTNERS, LP and AURELIUS CAPITAL MASTER, LTD v. THE REPUBLIC OF ARGENTINA | 07 Civ. 11327 (TPG) |
| BLUE ANGEL CAPITAL I LLC v. THE REPUBLIC OF ARGENTINA | 07 Civ. 2693 (TPG) |
| AURELIUS CAPITAL MASTER, LTD. and ACP MASTER, LTD. v. THE REPUBLIC OF ARGENTINA | 09 Civ. 8757 (TPG) |
| AURELIUS CAPITAL MASTER, LTD. and ACP MASTER, LTD. v. THE REPUBLIC OF ARGENTINA | 09 Civ. 10620 (TPG) |
| AURELIUS OPPORTUNITIES FUND II, LLC and AURELIUS CAPITAL MASTER, LTD. v. THE REPUBLIC OF ARGENTINA | 10 Civ. 1602 (TPG) |
| AURELIUS OPPORTUNITIES FUND II, LLC and AURELIUS CAPITAL MASTER, LTD. v. THE REPUBLIC OF ARGENTINA | 10 Civ. 3507 (TPG) |
| AURELIUS CAPITAL MASTER, LTD. and AURELIUS OPPORTUNITIES FUND II, LLC v. THE REPUBLIC OF ARGENTINA | 10 Civ. 3970 (TPG) |
| BLUE ANGEL CAPITAL I LLC v. THE REPUBLIC OF ARGENTINA | 10 Civ. 4101 (TPG) |
| BLUE ANGEL CAPITAL I LLC v. THE REPUBLIC OF ARGENTINA | 10 Civ. 4782 (TPG) |
| AURELIUS CAPITAL MASTER, LTD. and AURELIUS OPPORTUNITIES FUND II, LLC v. THE REPUBLIC OF ARGENTINA | 10 Civ. 8339 (TPG) |

MEMORANDUM OF LAW OF NON-PARTY
BANCO DE LA NACIÓN ARGENTINA IN OPPOSITION TO PLAINTIFFS' MOTION
TO COMPEL BNA TO RESPOND TO PLAINTIFFS' SUBPOENA DUCES TECUM
AND IN SUPPORT OF DEFENDANT'S MOTION TO QUASH THE SUBPOENA

Mark S. Sullivan
Mario Diaz-Cruz, III
Laura M. Lestrade
DORSEY & WHITNEY LLP
250 Park Avenue
New York, New York  10177
(212) 415-9200

Attorneys For Non-Party
  Banco de la Nación Argentina,

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND .........................................................................................................................2

ARGUMENT ...............................................................................................................................7

    POINT I ...................................................................................................................................7

    THE SUBPOENA IS OPPRESSIVE AND UNDULY BURDENSOME AND SEEKS
    DISCOVERY BEYOND THAT ALLOWED UNDER THE APPLICABLE RULES ...........7

    POINT II

    FOREIGN LAW PROHIBITS THE PRODUCTION OF DOCUMENTS SOUGHT IN THE
    SUBPOENA .........................................................................................................................10

    A.  The Subpoena Conflicts with the Laws of the Foreign Jurisdictions ................................10

        1.  Spain ...............................................................................................................................11

        2.  Brazil ..............................................................................................................................12

        3.  Bolivia ............................................................................................................................13

        4.  Cayman Islands ...............................................................................................................14

        5.  Chile ...............................................................................................................................15

        6.  Panama ...........................................................................................................................17

        7.  Paraguay .........................................................................................................................17

        8.  Uruguay ..........................................................................................................................18

    B.  Foreign Law Considerations Outweigh The Need For Discovery ....................................20

CONCLUSION ...........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey,*
    No. 11 Civ. 6746 (RKE)(HBP), 2012 WL 4791804 (S.D.N.Y. Oct. 9, 2012) ...............................7

*Candor Diamond Corp. v. Rama Mfg. Co., Inc.,*
    26 B.R. 847 (S.D.N.Y. 1983) .........................................................................................................9

*EM Ltd. v. Republic of Argentina*
    695 F.3d 201 (2d Cir. Aug. 20, 2012), *reh'g denied*, No. 11-4065 (2d Cir. Oct. 10,
    2012) .......................................................................................................................5, 6, 8, 10

*First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba,*
    462 U.S. 611 (1983) ......................................................................................................................8

*GMA Accessories, Inc. v. Electric Wonderland, Inc.*
    No. 07 Civ. 3219 (PKC) (DF) 2012 WL 1933558 (S.D.N.Y. May 22, 2012) ...............................9

*Gucci America, Inc v. Li,*
    No. 10 Civ. 4974 (RJS), 2011 WL 6156936 (S.D.N.Y. Aug. 23, 2011) ...........................20, 21, 22

*Katz v. Batavia Marine & Sporting Supplies, Inc.,*
    984 F2d 422 (Fed. Cir. 1993) ........................................................................................................9

*Milliken & Co. v. Bank of China,*
    758 F. Supp. 2d 238 (S.D.N.Y. 2010) .........................................................................................21

*Minpeco S.A. v. Conticommodity Services, Inc.,*
    116 F.R.D. 517 (S.D.N.Y. 1987) ................................................................................................25

*NML Capital, Ltd. v. Banco Central de la Republica Argentina,*
    No. 10-1487 ..................................................................................................................................24

*Peterson v. Islamic Republic of Iran,*
    No. 08-17756 ................................................................................................................................24

*Rubin v. Islamic Republic of Iran,*
    637 F.3d 783 (7th Cir. 2011) cert. denied (2012) .......................................................................23

*Rubin v. Islamic Republic of Iran,*
    No. 11-431 (May 25, 2012) .....................................................................................................23, 24

*Seijas v. Republic of Argentina,*
    No. 11-1714-cv, 2012 WL 5259030 (2d Cir. Oct. 25, 2012) ........................................................4

*Tiffany (NJ) LLC v. Andrew,*
    276 F.R.D. 143 (S.D.N.Y. 2011) ....................................................................20

*Tiffany (NJ) LLC v. Forbse,*
    No. 11 Civ. 4976 (NRB), 2012 WL 1918866 (S.D.N.Y. May 23, 2012) ......................23

*U.S. v. First Nat'l City Bank,*
    396 F.2d 897 (2d Cir. 1968).........................................................................20

*U.S. v. IBM,*
    83 F.R.D. 97 (S.D.N.Y. 1979) .......................................................................8

RULES AND STATUTES

28 U.S.C. § 1610(a) .....................................................................................5

Fed. R. Civ. P. 26.....................................................................................9, 21

Fed. R. Civ. P. 69 ..................................................................................8, 9, 10

Fed. R. Civ. P. 45(c)(1)................................................................................7

CPLR § 5223................................................................................................10

Non-Party Banco de la Nación Argentina ("BNA") submits this memorandum of law in opposition to the motion by plaintiffs Aurelius Capital Partners, LP, Aurelius Capital Master, LTD, Blue Angel Capital I LLC, ACP Master, LTD and Aurelius Opportunities Fund II, LLC (collectively, "Plaintiffs" or "Aurelius") for an order compelling BNA to produce documents pursuant to a non-party subpoena dated December 12, 2011 (the "Subpoena"), and in support of the motion by defendant the Republic of Argentina (the "Republic) to quash the Subpoena and subpoenas served on other non-party banks.

## PRELIMINARY STATEMENT

Plaintiffs have various judgments and pending actions against the Republic.  BNA is one of 18 non-party banks served with almost identical subpoenas.  No issue is taken with Plaintiffs' efforts to obtain information relevant to their claims, but their indifference to the burden imposed on non-parties, their intransigence in making even modest modifications to their sweeping requests and their failure to offer any justification for their extreme positions demonstrates their disregard for the prudence and proportionality required by the Federal Rules.  The Subpoena contains 45 open-ended requests seeking discovery of every conceivable asset, transaction and financial relationship of "Argentina" anywhere in the world over a more than four-year period. The Subpoena seeks this information concerning not only the Republic, but also with respect to at least 461 additional entities as to which Plaintiffs have no judgments or pending actions, and many of which, according to the Republic's motion to quash, are separate juridical entities with no connection to the Republic.  Plaintiffs make no showing as to why such non-party entities should be considered one and the same as the Republic, held responsible for its debts, and subjected to the Subpoena's reach, or why documents concerning these entities have any bearing on the judgments or any other issues in the underlying cases.  BNA and the other non-party

banks have put forth proposals for narrowing the scope of their respective subpoenas, particularly the vastly overbroad definition of "Argentina," but Plaintiffs have obstinately refused to narrow the scope in any respect whatsoever.

These deficiencies establish that the Subpoena: (1) is vastly overbroad and not reasonably calculated to assist in the enforcement of Plaintiffs' judgments; (2) exceeds the scope of discovery allowed under the Federal Rules of Civil Procedure and the New York Civil Practice Laws and Rules; (3) places an undue and unnecessary burden on non-parties to the litigation; and (4) if enforced with respect to documents maintained by BNA outside of the United States, would require BNA to violate the bank confidentiality and data protection laws of the non-United States jurisdictions in which BNA maintains branches (the "foreign jurisdictions")[1], thereby exposing BNA to criminal penalties, civil claims and/or administrative sanctions.

## BACKGROUND

### The Aurelius Subpoena

#### The Broadness and Scope of the Requests

The Subpoena contains 45 open-ended requests, plus 46 subparts, that seek every manner of financial information covering a period of almost four years. There is absolutely no specificity in the requests, nor any geographic limitation.[2] For example, Request No. 14 seeks "[d]ocuments sufficient to identify each asset, debt or property of any kind whatsoever located anywhere in the world that Argentina owned during the Relevant Time Period." In addition to this catch-all request, the Subpoena catalogues a superabundance of documents in a remarkable list of requests spanning nine pages and including "all reports used to monitor compliance with Bank Secrecy Act, Anti-Money Laundering or Office of Foreign Asset Control reporting

---

[1] The foreign jurisdictions are Bolivia, Brazil, Cayman Islands, Chile, Panama, Paraguay, Spain and Uruguay.

[2] However, Plaintiffs state in their moving papers that they are not seeking documents located in Argentina.

requirements"; "account or customer information, . . . including at a minimum any linked or related accounts, all account beneficiaries, agents, guarantors, and customers"; custodial services; trustee services; "advisory, investment, banking, capital markets, commercial banking or other financial services"; "other services, including agent, broker, dealer, underwriter, trading agent, asset manager, representative or nominee"; "real estate located outside of Argentina owned, leased or maintained by or for the benefit of Argentina"; "gold, silver, platinum or other precious or semi-precious metals or gemstones"; "commodities, minerals or natural resources"; "interests in patents or other intellectual property"; "royalty payments or any other payments to or for the benefit of Argentina"; and "property held by or deposited with any court or legal system or paying agent or other custodian."

**The Definition of Argentina**

The specific requests in the Subpoena would be vastly overbroad and place an undue burden on non-party BNA even if they applied solely to the Republic. However, they also purport to apply to the list of 461 entities, most of which owe no judgments to Plaintiffs. The Subpoena defines "Argentina" as follows:

> [T]he Republic of Argentina, [including] its agencies, instrumentalities, ministries, political subdivisions, representatives, secretariats, undersecretariats, commissions, councils, offices, institutes, funds, State Controlled Entities [defined in the Subpoena as "any agency, corporation, department, ministry, subdivision or other entity controlled directly or indirectly by Argentina, or of which more than 25% of the equity or other ownership interest is directly or indirectly owned, held or controlled by Argentina"] and all other Persons acting or purporting to act for or on behalf of Argentina, (whether or not authorized to do so), and all Persons listed in Exhibit 1 attached hereto.

The non-exclusive list of 461 entities in Exhibit 1 includes entities that are presumptively separate from the Republic and several of which have already been judicially declared separate

from the Republic and not liable for its debts, including BNA itself.[3]  BNA has maintained that the parties to this action, not the non-party banks, are in the best position to define which entities may be considered part of the Republic.  The Republic prepared a spreadsheet that divided Plaintiffs' list of 461 entities into various categories, and identified 94 entities for discussion regarding the definition of "Argentina."  See Republic's Brief at 6.  According to the Republic, Plaintiffs committed to reviewing the spreadsheet but never responded or offered any counter-proposal.  *Id.*  Nor have Plaintiffs offered any showing whatsoever as to why information concerning any of the non-party entities they have included in their definition comes within the scope of permissible discovery.  *Id.* at 9-11.

**Documents Already Produced to Aurelius by BNA**

On November 10, 2010, Plaintiffs served a subpoena on BNA seeking copies of all documents produced by BNA pursuant to a 2010 subpoena served by NML Captial, Ltd. on BNA in actions against the Republic (the "NML Subpoena").  In compliance with Plaintiffs' 2010 subpoena, on January 6, 2012, BNA produced to Plaintiffs extensive documentation of over 8800 transactions based on a list of 225 entities used as the definition of "Argentina" in the NML Subpoena.[4]  The list consists almost entirely of political subdivisions of the Republic that are listed under the heading "Ministries, Secretariats, Ministers and Secretaries."  See Declaration of Mark S. Sullivan, dated November 7, 2012 ("Sullivan Decl.") at Ex. 9.

**BNA's Objections to the Subpoena**

BNA objected to the Subpoena because, among other reasons: (i) it is overbroad and unduly burdensome in scope, including with respect to the definition of "Argentina;" (ii) it is vague and ambiguous in many respects; (iii) the relevant time period is unreasonably long; (iv)

---

[3] See *Seijas v. Republic of Argentina*, No. 11-1714-cv, 2012 WL 5259030 (2d Cir. Oct. 25, 2012).
[4] The NML Subpoena originally set forth a broad definition of "Argentina" that included "State Controlled Entities" but through the meet and confer process the definition was modified to include only the list of the 225 governmental entities.

foreign laws prohibit the disclosure of customer information maintained in the foreign jurisdictions; and (v) it exceeds the scope of permissible discovery under the Foreign Sovereign Immunities Act.[5]  See Finkelstein Decl. at Ex. 28.

### Plaintiffs' Obstinacy During the "Meet and Confer" Process

Plaintiffs have flat out refused to modify the Subpoena in any way during the meet and confer process.  BNA met and conferred with Plaintiffs on January 9, 2012 and explained its positions, including the bases for its objections.  With respect to the definition of "Argentina," BNA proposed to use the definition from the NML Subpoena, *i.e.* the list of the 225 governmental entities, rather than the expanded list of 461 entities demanded by Plaintiffs.[6]  But instead of offering to modify its definition, Plaintiffs put the burden on BNA to identify every entity on the list to which BNA had an objection.  Plaintiffs also refused to modify any other aspect of the Subpoena.

On February 15, 2012, BNA provided legal opinions to Plaintiffs that set forth the specific provisions of foreign law barring disclosure of customer information maintained by BNA in the foreign jurisdictions.  BNA also repeated its proposal to adopt the definition of "Argentina" used in the NML Subpoena.  But again, Plaintiffs refused to make any modification.  Rather than engaging in a meaningful dialog, on April 9, 2012 Plaintiffs sent a letter effectively silencing any further discussion by framing the issue as whether BNA intended to "stand by" its objections or whether Plaintiffs "need to bring [these] issues to the Court for resolution."  The letter also demanded proof of whether the foreign laws cited by BNA were being actively

---

[5] BNA also objected to the Subpoena on the ground that post-judgment discovery concerning assets of a foreign state is limited to assets that are subject to execution under the FSIA, *i.e.* assets (i) belonging to a foreign state judgment debtor, which are (ii) located in the United States and (iii) used for a commercial activity in the United States. 28 U.S.C. § 1610(a).  BNA is mindful of the Second Circuit's decision in *EM Ltd. v. Republic of Argentina* 2012 WL 3553367 (2d Cir. Aug. 20, 2012), *reh'g denied*, No. 11-4065 (2d Cir. Oct. 10, 2012) but wishes to preserve its objections under the FSIA.

[6] This proposal preceded the Republic's identification and classification of the 461 entities whose information is called for in the Subpoena.  See Republic's Brief at 6.

- 5 -

enforced.[7]  Finkelstein Decl. Ex. 56. As for the definition, Plaintiffs again attempted to put the burden on BNA to comb through the hundreds of entities, even though BNA had pointed out the inherent defect that Plaintiffs' list included entities, such as BNA itself, that had been judicially determined to be separate and independent from the Republic.

On May 22, 2012, BNA asked Plaintiffs to explain their basis for speculating that the foreign laws would not be enforced.  BNA also suggested that Plaintiffs negotiate the definition of Argentina with counsel for the Republic because the parties were better situated than non-party BNA to resolve this issue.  Finkelstein Decl. Ex. 57.  Plaintiffs never responded to either issue.

Finally, on October 16, 2012 BNA proposed that the definition of "Argentina" be modified to track the list of 94 entities that had been identified by the Republic.  BNA agreed to search its records for accounts and transfers based in or effected through the U.S. for all of these 94 entities.  As BNA explained to Plaintiffs, BNA had already searched for 61 of the entities in responding to Plaintiffs' November 2010 Subpoena (because those entities were included in the definition of Argentina used in the NML Subpoena) and provided responsive documents in January 2012.  BNA now proposed to conduct this search for the remaining 33 entities that had not been included in the prior review.  Plaintiffs rejected this proposal and refused to modify the Subpoena in any way.

In an apparent effort to overcome these deficiencies and avoid having the Subpoena judged on its own merits, Plaintiffs argue, without basis, that the Subpoena should be enforced in its entirety because this Court and the Second Circuit have already ruled on the enforceability of identical subpoenas served on BNA and Bank of America in *NML Capital, Ltd. v. Rep. of*

---

[7] Supplemental declarations and opinions of foreign counsel are being submitted herewith that discuss this and other issues raised by Plaintiffs.

*Argentina,* 2011 WL 3897828, (S.D.N.Y. Sept 2. 2011), *aff'd sub nom. EM Ltd. v. Republic of*

*Argentina,* 695 F.3d 201 (2d Cir. Aug. 20, 2012), *reh'g denied,* No. 11-4065 (2d Cir. Oct. 10,

2012). That is simply not true and no reasonable comparison could consider the Subpoena and

the NML Supoena to be "identical." Whereas NML limited its subpoena to 3 requests, Plaintiffs

show no restraint and pile on 45 requests while also insisting on inflating an already extensive

definition to add hundreds of additional entities, many of which are presumptively independent

from the Republic. Indeed, the Subpoena goes so far beyond the NML Subpoena in terms of

scope, burden and definition that no meaningful comparison is justified.

## ARGUMENT

### POINT I

### THE SUBPOENA IS OPPRESSIVE AND UNDULY BURDENSOME AND SEEKS DISCOVERY BEYOND THAT ALLOWED UNDER THE APPLICABLE RULES

Federal Rule of Civil Procedure 45 requires that "reasonable steps [be taken] to avoid

imposing undue burden or expense on a person subject to the subpoena." Fed. R. Civ. P.

45(c)(1). Plaintiffs have taken no such steps -- not when drafting the Subpoena and not when

confronted by the non-party banks regarding the sheer over breadth of the individual requests

and the definition of Argentina.[8] The Subpoena calls for a surfeit of information and Plaintiffs

have refused to discuss limiting its scope in any way. Plaintiffs also have refused to resolve

definitional issues with the Republic before seeking to compel the non-party banks to produce a

vast amount of financial information concerning entities that in many instances have nothing to

do with the Republic.

---

[8] Plaintiffs' failure to comply with their meet and confer obligations is itself a ground for denying their motion to compel. See *Automobile Club of New York, Inc. v. Port Authority of New York and New Jersey,* No. 11 Civ. 6746 (RKE)(HBP), 2012 WL 4791804, at *6 (S.D.N.Y. Oct. 9, 2012).

Critically, Plaintiffs fail to offer any showing that the entities contained in their definition may properly be held responsible for the Republic's debts or provide any relevant information regarding the attachment or execution of assets. For example, the definition includes "agencies and instrumentalities" of the Republic, but it is well settled that agencies and instrumentalities of a foreign state are entitled to a presumption of separateness and may not be held responsible for the debts of their sovereign state except in limited circumstances. "[G]overnment instrumentalities established as juridical entities distinct and independent from their sovereign should normally be treated as such." *First Nat. City Bank v. Banco Para El Comercio Exterior De Cuba*, 462 U.S. 611, 626-627 (1983).

In determining the reasonableness of a subpoena, a court should consider "such factors as relevance, the need of the party for the documents, the breadth of the document request, the time period covered by it, the particularity with which the documents are described and the burdens imposed." *U.S. v. IBM*, 83 F.R.D. 97, 104 (S.D.N.Y. 1979). The Subpoena fails each one of these tests. It lacks specificity and seeks discovery of every conceivable financial fact of scores of non-party entities. Plaintiffs have failed to sufficiently tailor the Subpoena to lead to the attachment of assets of the Republic and therefore seek documents that are irrelevant, unnecessary and disproportionate to their collection efforts. The Second Circuit held in *EM Ltd. v. Republic of Argentina*, 695 F.3d 201, 2012 WL 3553367 (2d Cir. Aug. 20, 2012), *reh'g denied*, No. 11-4065 (2d Cir. Oct. 10, 2012) that the scope of non-party discovery of a judgment debtor's assets under Rule 69(a)(2) "is constrained principally in that it must be calculated to assist in collecting a judgment." 695 F.3d 207. The Subpoena ignores these constraints and places an unreasonable burden on BNA and the other non-party banks without any semblance of justification.

The Court should also take into consideration the identity of the party from whom
discovery is sought when determining the reasonableness of discovery. The Subpoena would be
unreasonable even if BNA were a party to the action. The fact that BNA is a non-party makes
the Subpoena all the more unreasonable. "Restrictions on discovery may be broader where a
non-party is the target of discovery to protect such third parties from unnecessary harassment,
inconvenience, expense or disclosure of confidential information." *Candor Diamond Corp. v.*
*Rama Mfg. Co., Inc.,* 26 B.R. 847, 849 (S.D.N.Y. 1983); *see also Katz v. Batavia Marine &*
*Sporting Supplies, Inc.,* 984 F2d 422 (Fed. Cir. 1993) ("Although Rule 26(b) applies equally to
discovery of nonparties, the fact of nonparty status may be considered by the court in weighing
the burdens imposed in the circumstances.") Despite BNA's status as a non-party, Plaintiffs
seeks to impose the massive burden of identifying, organizing, reviewing and producing vast
amounts of data about hundreds of separate entities. The search for and review of documents
concerning accounts and transactions since January 2009 for over 461 entities, not to mention the
vast amounts of other information located "anywhere in the world" including debts, contracts,
real estate, investments, financial transactions, commodities, precious metals, etc., would be a
huge undertaking and would subject BNA to unnecessary expense and disruption of its business
without any demonstration that the effort would serve any practical purpose.

The Subpoena is also defective because it vastly exceeds the scope of discovery under
Fed. R. Civ. P. 26 and 69. Rule 26(b)(1) limits discovery to matters "relevant to any party's
claim or defense" in the action. Rule 69 requires that post-judgment discovery in aid of a
judgment be focused on assets *of the judgment debtor.* See *GMA Accessories, Inc. v. Electric*
*Wonderland, Inc.* No. 07 Civ. 3219 (PKC) (DF) 2012 WL 1933558 at *5 (S.D.N.Y. May 22,
2012) (post judgment discovery concerning the assets of a non-party is not contemplated by

Rule 69(a)). Similarly, pursuant to CPLR § 5223, post-judgment asset discovery must be "relevant" to the satisfaction of the creditor's judgment. No such showing has been made for much of the information sought by the Subpoena, particularly with respect to all of the numerous entities that are juridically separate from the Republic and not responsible for its debts. Also, to the extent that judgments have not been entered against the Republic in certain of the pending actions, the asset discovery sought in the Subpoena is improper because it is not relevant to the claims and defenses in those actions.

Therefore, Plaintiffs' motion to compel should be denied and the Republic's motion to quash granted because the Subpoena places an unreasonable burden on BNA, seeks information that is irrelevant to the pending actions and not reasonably calculated to assist in collecting Plaintiffs' judgments. See *EM Ltd*, 2012 WL 3553367 at*4.

## POINT II

### FOREIGN LAW PROHIBITS THE PRODUCTION OF DOCUMENTS SOUGHT IN THE SUBPOENA

**A.      The Subpoena Conflicts with the Laws of the Foreign Jurisdictions**

As evidenced by the opinions and declarations of foreign law experts submitted by BNA (Sullivan Decl. Exhs. 1-8), disclosure pursuant to the Subpoena of information maintained in the foreign jurisdictions in which BNA maintains branches would force BNA to violate the data protection and/or bank confidentiality laws of these jurisdictions. Contrary to Plaintiffs' assertions, these laws are enforced in the foreign jurisdictions, thereby exposing BNA -- and in some jurisdictions its employees as well -- to criminal penalties, including imprisonment, civil damages and/or administrative sanctions. The circumstances relating to each of the foreign jurisdictions are set forth below:

1.    Spain

Law 44/2002 specifically applies to financial institutions and prohibits them from

disclosing financial information of both natural persons and legal entities.  Declaration of Jorge

A. Laspiur Nölting, dated October 24, 2012 ("Laspiur Decl.") ¶4, attached as Exhibit 1 to the

Sullivan Decl.

Financial institutions in Spain, including BNA's Spanish branch, are required to

"maintain confidentiality of any information related to balances, positions, transactions, and

other operations of their customers."  Law 44/2002, Seventeenth Additional Provision, § 1.

Laspiur Decl., ¶ 4.  The duty of confidentiality does not apply to information that may be

disclosed "by virtue of an authorization granted by the customer or under law, or any information

that may be requested by or shall be submitted to supervisory authorities" or to "the exchange of

information between credit institutions belonging to the same consolidated group."  Id., §§ 2,3;

Laspiur Decl., ¶ 4.  None of these exceptions is applicable here.

Foreign court orders do not operate as an exception to the prohibition against disclosure

of confidential financial information in Law 44/2002.  Only customer consent, a request by a

Spanish supervisory authority or an order from a Spanish court would permit BNA's Spanish

branch to disclose the information requested in the Subpoena.  Laspiur Decl. ¶ 7.

The penalties for noncompliance with Law 44/2002 are set forth in Law 26/1988, which

provides for the following sanctions: (1) as against the financial institution -- a fine of up to one-

half of one percent of its equity, or up to €500,000, whichever is greater, and a public

reprimand; and (2) as against employees of the financial institution -- private reprimand, public

reprimand, a fine of up to €250,000, and/or removal and disqualification from administrative or

managerial positions in any financial or credit institution for up to one year.  Law 26/1988,

§§ 10, 13.  Laspiur Decl. ¶ 4.

- 11 -

Law 44/2002 is enforced in Spain and legal proceedings have been brought against alleged violators. Thus, BNA would face a real risk of sanctions if it were to provide information in violation of Spanish law. Laspiur Decl. ¶ 6.

**2.    Brazil**

Article 5 of the Brazilian Federal Constitution sets forth a general right to privacy, which includes the inviolability of correspondence and communications, except where authorized by law. Declaration of Rosamaria Herminia Hila Barna, dated October 24, 2012 ("Barna Decl."), ¶ 4, attached as Exhibit 2 to the Sullivan Decl.

In the case of financial institutions, the general right to privacy embodied in the Brazilian Constitution is supplemented by Supplementary Law 105/2001, which specifically mandates that Brazilian financial institutions maintain the secrecy of operations and banking services. Barna Decl. ¶ 5.

Article 1 of Law 105/2001 states: "Financial institutions are required to maintain secrecy in their transactions of any nature and in services rendered." Failure to comply with the obligation to maintain secrecy constitutes a crime and subjects a financial institution (as well as its employees) to penalties including "imprisonment from one to four years and a fine, and the applicable penalties prescribed by the Penal Code, without prejudice to other applicable sanctions." Law 105/2001, Art. 10; Barna Decl. ¶ 5.

Exceptions that are "authorized by law" and permit disclosure of confidential information by a financial institution are specified in Articles 3 and 4 of Law 105/2001 and include an official request by the Central Bank of Brazil or the Securities Commission, or a judicial order. The term "judicial order" as used in Law 105/2001 refers to an order issued by a Brazilian court or a foreign order that has been officially confirmed by Brazil's highest court, the Supremo Tribunal Federal ("STF"). In Case AgRg na CR.998/IT, which involved the submission of

letters rogatory from Italy, the STF stated that, "the [foreign judgment] must be officially confirmed in the Brazilian jurisdiction," and held that the exception for judicial orders applies to a judicial order issued by a Brazilian judge or in the case of a foreign order it must have been officially confirmed by the STF.  Barna Decl., ¶¶7 and 8.

Without such a confirmation, neither the Subpoena nor an order by a foreign court operate as exceptions to the prohibition against disclosure of confidential financial information in Law 105/2001.  Thus, the disclosure by BNA's Brazilian branches of the information sought in the Subpoena, without confirmation by a Brazilian court, would violate Brazilian law.  Barna Decl. ¶¶ 8 and 9.

Supplementary Law 105/2001 is enforced in Brazil and legal proceedings have been brought against alleged violators, including in 2008 and 2009.  Barna Decl. ¶ 6.  Thus, BNA's Brazilian branches would face a real risk of civil and criminal sanctions if they were to provide financial information in violation of Brazilian law.  *Id.*

3.    **Bolivia**

Law 1488 enacted through Decree D.S. 26581 requires financial institutions, such as BNA's Bolivian branch, to maintain the confidentiality of client transactions, except in the case where a "well-founded court order" directs the disclosure of such information.  An order of a foreign court is not considered a "well-founded court order" under Law 1488 unless a determination has been made by the Supreme Court of Bolivia that the foreign order is consistent with Bolivian law.  Legal Opinion of Dr. Luis F. Calvo Moscoso, ("Calvo Opinion") ¶¶ 3,5, attached as Exhibit 3 to the Sullivan Decl.

The process for obtaining the authorization of the Supreme Court of Bolivia requires the submission of a petition through the Supervisory Authority of the Financial System, which is the governing body of the Bolivian banking system.  Without such authorization of the Supreme

- 13 -

Court of Bolivia, the Subpoena or an order from a foreign court would not constitute a "well-founded court order" that would permit disclosure of confidential information under Bolivia's laws. Calvo Opinion, ¶ 5

       The disclosure by BNA's Bolivian branch of the information sought by the Subpoena would violate Bolivia's bank confidentiality laws. Calvo Opinion, ¶ 6. Violations of Law 1488 may be punished by civil, administrative and/or criminal sanctions, and would expose BNA's Bolivian branch to real consequences as evidenced by legal proceedings brought against alleged violators. Calvo Opinion, ¶ 4.

       **4.**    **Cayman Islands**

       The Confidential Relationships (Preservation) Law (2009 Revision) (the "Confidentiality Law") and the common law of the Cayman Islands both prohibit a bank operating in the Cayman Islands, such as BNA's Cayman branch, from disclosing customer information. Under the common law, there is an implied term in all contracts between banks and their customers that the bank must not divulge to third parties information about the customer's accounts or transactions except in the case of the limited exceptions discussed below. Disclosures of customer information in breach of this implied term would subject the bank to damages for breach of contract. Similarly, the Confidentiality Law restricts the disclosure of confidential information, which is defined to include information regarding a customer's deposits and transfers, again with certain limited exceptions. Violations of the requirements of the Confidentiality Law carry criminal penalties. Under Section 5(1), a bank and "every person subordinate or in the employ or control of" the bank who divulges, or attempts, offers or threatens to divulge, confidential information entrusted to the bank is liable on summary conviction to a fine of KY\$ 10,000 and imprisonment for four years. See Legal Opinion of Smeets Law ("Smeets Opinion"), ¶ 4.3, attached as Exhibit 4 to the Sullivan Decl.

As discussed in the Smeets Opinion, under the common law's implied contractual duty of confidentiality owed by a bank to its customer, there is no specific exception that would permit disclosure based upon the Subpoena or an order from a foreign court. While there is an exception based upon disclosure under "compulsion of law," this exception was discussed in the case of *FDC Co. Ltd. v. Chase Manhattan Bank NA*, which held that the compulsion had to be that of the law of the local jurisdiction. Therefore, neither the Subpoena nor a foreign order falls within the exception for disclosure under "compulsion of law." Smeets Opinion ¶ 4.4.

The Confidentiality Law permits disclosure of customer information in accordance with "any other law." But this exception applies only to disclosures specifically permitted by the law of the Cayman Islands, such as an express provision for disclosure in another Cayman Islands statute. The laws of the United States, and specifically the Subpoena or a U.S. court order, do not fall within this exception, as they are not laws applicable to the Cayman Islands. *Id.*

Based on the foregoing, in the absence of an explicit direction from the Grand Court of the Cayman Islands, BNA would be in violation of Cayman Island law, and would subject itself to civil damages and criminal penalties if it disclosed the customer information encompassed within the Subpoena. *Id.*

###### 5. Chile

Article 154 of Chile's General Bank Act (D.F.L. Number 3, dated November 26, 1997) mandates that financial institutions shall not disclose information about their customer's "deposits or other moneys in transactions of any nature," except to the customer itself "or any person explicitly authorized thereby or the individual legally representing him." Declaration of Gianella Patroni Jara, dated October 19, 2012 ("Patroni Decl."), ¶ 4; attached as Exhibit 5 to the Sullivan Decl.

Any breach of the duty to maintain confidentiality is a crime subject to punishment consisting of imprisonment ranging from 61 days to 3 years (Art.56, Criminal Code).  In addition to criminal penalties, a financial institution may also be subject to civil liability as a result of the disclosure of confidential information.  Patroni Decl., ¶ 5.

Pursuant to the General Bank Act, the only exceptions to the prohibition against the disclosure of confidential banking information are that (a) "ordinary and military courts may, for the purposes of any actions pending before them, order the submission of information on specific transactions directly related to the proceedings, on deposits, moneys received or other transactions of any nature conducted by those considered parties or defendants in such cases or order the inspection thereof, as necessary"; and (b) "[p]ublic prosecutors, following authorization by judges involved in investigation proceedings, may require inspection of those transactions or require submission of such information for the purposes of [matters directly related to the investigation]."  General Bank Act, Art. 154; Patroni Decl., ¶ 7.

Reference in the General Bank Act to an order from "ordinary and military courts," refers to courts established under Chilean legislation and not to foreign courts.  Art. 5º Code of Courts. Patroni Decl., ¶ 8.  In order for a foreign court order to fall within the exception under the General Bank Act that permits disclosure of confidential information, such order must be confirmed by the Supreme Court of Justice through the *exequatur* process set forth in Articles 242-251 of the Code of Civil Procedure.  Patroni Decl., ¶ 9.

For the above mentioned reasons, the disclosure by BNA's Chilean branch of the information sought in the Subpoena would violate Chile's bank confidentiality laws.  Such laws are enforced in Chile and legal proceedings have been brought against alleged violators.  Thus,

- 16 -

BNA would face a real risk of civil and criminal sanctions in Chile if it were to provide financial information in violation of the law.  *Id.*

6.     **Panama**

Panama's Bank Confidentiality law, which is contained in Article 111 of Executive Decree No. 52 dated April 30, 2008, mandates that banks not disclose information concerning their customers:  "Banks shall only disclose information about their clients or their transactions under their express consent."  Client consent for disclosure of information is not required "when the information is requested by competent authorities in accordance with law."  This exception refers to official requests from Panamanian judges or the Superintendent of Banks, and not to subpoenas or orders issued by foreign courts.  Declaration of Octavio Amat, dated October 24, 2012 ("Amat Decl."), ¶ 7, attached as Exhibit 6 to the Sullivan Decl.

Violations of Executive Decree No. 52 are punishable by fines of up to 500,000 Balboas, (Article 185) or loss of the bank's license (Article 56).  Amat Decl., ¶¶ 7, 10.

Articles 111 and 185 of Executive Decree No. 52 are enforced in Panama and the Superintendence of Banks of Panama is in charge of initiating administrative proceedings against alleged violators.  Amat Decl., ¶ 8.  BNA would therefore face a real risk of sanctions if it were to provide information concerning its customers in violation of the law.

7.     **Paraguay**

Article 84 of Law 861/96 imposes on financial institutions, such as BNA's Paraguay branch, the obligation of confidentiality and prohibits such entities, as well as their directors, management and employees, from disclosing any information regarding client transactions.  Declaration of Benigno M. Lopez Benitez, dated October 24, 2012 ("Lopez Decl."), attached as Exhibit 7 to the Sullivan Decl.  Disclosure is permitted only in the case of one of the following exceptions set forth in Articles 84 and 86: written authorization is provided by the client; the

- 17 -

information is required by the Paraguay Central Bank and the Superintendence of Banks in use of their legal powers; the information is required by competent judiciary authorities in a decision passed in a lawsuit where the person whose banking records shall be examined is a party; the information is required by the General Comptroller and tax authorities of the Republic within the framework of their powers; or the information is required by credit institutions exchanging information between them, under banking practices and reciprocity agreements. Lopez Decl., ¶7.

With respect to the exception regarding decisions from "competent judiciary authorities," the order must come from the Paraguayan judiciary. Rulings, decisions and judgments from foreign courts apply only if they have been approved by a Paraguayan court pursuant to the *exequatur* process set forth in Articles 532, 534 and 535 of the Code of Civil Procedure. Lopez Decl. ¶¶ 8, 9.

Section 147 of Paraguay's Penal Code imposes punishment of imprisonment for a term not to exceed one year or a fine for the unauthorized disclosure of client information in violation of Law 861/96. In addition, Articles 1833 and 1842 of the Civil Code impose civil damages and Article 83 of Law 489/95 imposes administrative sanctions. Lopez Decl. ¶ 11.

For the above stated reasons, disclosure by BNA's Paraguay branch of the information sought in the Subpoena would violate Paraguay's bank confidentiality laws, and expose BNA's Paraguay branch to criminal, civil and administrative sanctions.

8.    **Uruguay**

Decree Law 15322, Section 25 prohibits financial institutions from disclosing information about their clients' funds, transactions, securities and other confidential information. Declaration of Dr. Gonzalo Moratorio Garayalde, dated October 24, 2012, ("Moratorio Decl."), ¶¶ 4,5, attached as Exhibit 8 to the Sullivan Decl. The only exceptions contained in Section 25

to the prohibition against disclosure are (i) if the client has provided written authorization; (ii) pursuant to a reasoned order of a criminal court; or (iii) pursuant to a reasoned order of a competent court dealing with a maintenance obligation. Moratorio Decl. ¶¶ 5,7. Other possible exceptions are specific cases concerning tax administration, the collection of penalties arising from the bank customer's failure to comply with labor laws and pursuant to Law No. 17948, which allows the Central Bank of Uruguay to provide information on banking loan transactions under limited circumstances. Because none of these exceptions applies here, Uruguay's bank confidentiality law bars BNA from providing the information sought in the Subpoena. Moratorio Decl. ¶ 8.

Violation of Decree Law 15322 constitutes a crime and is punishable by imprisonment for a term of three months to three years. Moratorio Decl., ¶ 5. In addition, a financial institution can be subject to administrative sanctions by the Superintendent of Financial Institutions, as well as civil damages. Moratorio Decl., ¶ 9.

The Code of General Process (Law 15982, Article 524 et seq.), sets forth the procedures for requesting information or documents maintained by a financial institution in Uruguay. These procedures direct that formal requests or letters rogatory be submitted to the Uruguayan courts. Moratorio Decl., ¶ 12. If BNA's Uruguay branch were to disclose the information sought by the Subpoena it would violate the bank confidentiality law and be subject to the penalties and sanctions discussed above.

As evidenced by the declarations and opinions of counsel in each of the foreign jurisdictions in which BNA maintains operations, disclosure of the information sought by the Subpoena would violate laws in those jurisdictions and subject BNA to criminal, civil and/or administrative sanctions.

**B.     Foreign Law Considerations Outweigh The Need For Discovery**

The law in this circuit instructs that all applicable foreign law implications be considered

with respect to requests for discovery of information located in, or subject to the laws of, a

foreign country. *U.S. v. First Nat'l City Bank*, 396 F.2d 897, 902 (2d Cir. 1968). "Where a party

from whom discovery is sought asserts foreign law as a bar to production, courts perform a

comity analysis to determine the weight to be given to a foreign jurisdiction's law." *Tiffany (NJ)*

*LLC v. Andrew*, 276 F.R.D. 143, 151 (S.D.N.Y. 2011).

"In determining whether to order a party to produce documents in contravention of the

laws of a foreign country, courts in this Circuit have employed the five-factor test set forth in the

Restatement (Third) of Foreign Relations Law of the United States § 442(1)(c)." *Gucci America,*

*Inc v. Li*, No. 10 Civ. 4974 (RJS), 2011 WL 6156936 at *5 (S.D.N.Y. Aug. 23, 2011) (citations

omitted).

> Pursuant to [the Restatement], courts deciding whether to order production of
> documents located abroad are directed to consider: (i) the importance to the
> investigation or litigation of the documents or other information requested; (ii) the
> degree of specificity of the request; (iii) whether the information originated in the
> United States; (iv) the availability of alternative means of securing the
> information; and (v) the extent to which noncompliance with the request would
> undermine important interests of the United States, or compliance with the request
> would undermine important interests of the state where the information is
> located." In addition, courts in the Second Circuit may also consider the hardship
> of compliance on the party or witness from whom discovery is sought and the
> good faith of the party resisting discovery.

*Id.* (quotations and citations omitted).  A balancing of the Restatement factors in this

case weighs in favor of BNA and against Plaintiffs' motion to compel.

1.     The importance to the litigation of the documents requested.  When the

documents requested are relevant to the issue of liability, this factor weighs in favor of ordering

production. *Tiffany v. Andrew*, 276 F.R.D. at 151 ( "Because the Banks' records could

potentially reveal the identities of those involved in the counterfeiting operation, they are

important to plaintiff's claims."); *see also Gucci v. Li*, 2011 WL 6156936 at *6. That is not the case here. First, in the cases in which Plaintiffs have already obtained judgments, liability was determined long ago. In the other cases, the asset based discovery is not relevant to the claims and defenses in the action and therefore are beyond the scope of discovery under Fed. R. Civ. P. 26. Plaintiffs argue that the documents are necessary for them to collect their judgments against the Republic. However, as discussed above, the documents requested go way beyond the proper scope of discovery as they relate to entities against which Plaintiffs have no judgments and that may not properly be considered part of the Republic. Because the documents are not necessary to the determination of liability, and far exceed the scope of appropriate post-judgment asset discovery, this factor weighs in favor of BNA and against compelling BNA to violate the laws of the foreign jurisdictions.

2. <u>The degree of specificity of the request</u>. The Subpoena lacks any specificity with respect to actual assets, accounts, transfers or debts of the Republic. Other cases have found that where the discovery requests identified specific accounts, such requests were sufficiently specific for this factor to tip in favor of requiring production. *Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 247 (S.D.N.Y. 2010) ("where the requesting party sought information limited to specific accounts, the requests here are narrowly tailored, and this factor therefore supports [the requesting party]") (*citing Gucci America, Inc. v. Curveal Fashion*, 2010 WL 808639 (S.D.N.Y., March 8, 2010) at *3). That is not the case here. Rather, the Subpoena contains 45 open-ended requests that seeks general asset and transactional discovery regarding more than 461 entities, without regard to whether such assets belong to the Republic. Thus, this factor weighs in favor of BNA and against compelling BNA to violate the laws of the foreign jurisdictions.

3.     <u>Whether the information originated in the United States</u>.  BNA has already

produced to Plaintiffs extensive documentation of more than 8800 transactions regarding the 225

entities contained in the definition of Argentina used in the NML Subpoena.  This documentation

related to accounts maintained at, or transactions effected through, BNA's New York Branch or

Miami Agency.  Thus, all documents originating in the United States concerning these 225

entities have already been produced.  In addition, BNA has offered to search its New York

Branch and Miami Agency for accounts and transactions concerning an additional 33 entities

(these are the entities from the list of 94 identified by the Republic for discussion purposes that

were not part of the 225 entities listed in NML's definition).  Plaintiffs have refused, however, to

modify their definition of Argentina in any way.  Therefore, because BNA has either already

produced or offered to produce the documents originating in the United States for entities falling

within a reasonable and justifiable definition of Argentina, this factor weighs in favor of BNA

and against ordering BNA to violate the laws of the foreign jurisdictions.  "Where the

information at issue originated and remains located outside of the United States, this factor

weighs against the requesting party." *Gucci v. Li*, 2011WL 6156936 at *6.

4.     <u>The availability of alternative means of securing the information</u>.  All of the

foreign jurisdictions provide alternative means of obtaining discovery, none of which have been

attempted by Plaintiffs.  Moreover, Plaintiffs have served an almost identical document request

on the Republic.  Because other methods of obtaining the discovery sought in the Subpoena are

available to Plaintiffs, this factor weighs in favor of denying Plaintiffs' motion to compel.

5.     <u>The relative interests of the states</u>.  This factor weighs squarely *against* ordering

the discovery sought by Plaintiffs.  The foreign jurisdictions clearly have an interest in the

enforcement of their bank confidentiality and data protection statutes, some of which provide

criminal penalties for noncompliance. The interests of the United States are mixed, but ultimately favor *not* permitting the discovery sought in the Subpoena. Although the United States has an interest in compliance with the judgments of its courts, because this is a discovery dispute between civil litigants, this interest is relatively weak. *Tiffany (NJ) LLC* v. *Forbse*, No. 11 Civ. 4976 (NRB), 2012 WL 1918866 (S.D.N.Y. May 23, 2012) at *8. (Such interest is "not as great . . . [where] the discovery request is initiated by a private, civil litigant. . . .") In addition, BNA's status as a non-party further "attenuate the United States interest in enforcing discovery obligations.") *Id.* (citations omitted).

Moreover, in cases involving the enforcement of a judgment against a foreign sovereign, the United States has expressed the view that discovery of the type sought by Plaintiffs exceeds the scope of the FSIA and therefore should not be permitted. Earlier this year, the United States filed an *amicus curiae* brief urging the United States Supreme Court to deny certiorari in *Rubin v. Islamic Republic of Iran*, 637 F.3d 783 (7th Cir. 2011) cert. denied (2012). The brief of the United States fully supports the Seventh Circuit's holding in *Rubin* that general asset discovery of a foreign sovereign violates the FSIA and should not be permitted. "To permit burdensome discovery into a foreign state's property without regard to whether that property might fall within an exception to immunity would vitiate the FSIA's protections." Brief for the United States as Amicus Curiae, *Rubin v. Islamic Republic of Iran*, No. 11-431 (May 25, 2012) at p. 11. The United States' position concerning discovery of a foreign sovereign "reflects comity and reciprocity concerns." *Id.* "Compelling a foreign state to produce extensive material in discovery concerning its assets [similarly] may impose significant burdens and impugn the state's dignity, and may have implications for the United States' foreign relations. . . . [s]uch

discovery may also have reciprocal consequences for the treatment of the United States in foreign courts."[9]  *Id.* at pp. 11-12.

      6.    <u>The good faith of the party resisting discovery</u>.  BNA finds itself in a genuine predicament.  If it complies with the Subpoena, it violates the laws of the foreign jurisdictions.  BNA has already made a substantial production, including documentation of over 8800 transactions that passed through its New York Branch and/or its Miami Agency.  BNA has also made a good faith attempt to meet and confer with Plaintiffs in an attempt to narrow the extraordinarily overbroad Subpoena and has offered to search its U.S. records for an additional 33 entities, but all of this has been to no avail.

      7.    <u>The hardship of compliance</u>.  Full compliance with the Subpoena would result in undue hardship for BNA.  Citing *Air Cargo Shipping Services Antitrust Litig.*, 2010 WL 2976220 (E.D.N.Y. July 23, 2010), Plaintiffs argue that in order to establish hardship, BNA "must show that it is likely that the foreign law will be enforced."  Plaintiffs' Brief at 33.  However, unlike the defendant in *Air Cargo*, BNA has come forward with evidence that the bank confidentiality and data protection laws *are* enforced in the foreign jurisdictions and that BNA would face a real risk of civil, criminal and administrative consequences if it were to produce financial documents maintained in the foreign jurisdictions.[10]  See Sullivan Decl., Exs. 1-8.

---

[9] The United States has filed other amicus briefs recently in support of limiting, pursuant to the FSIA, post-judgment asset discovery of a foreign state to property that is subject to an exception to immunity from execution.  *See* Brief of the U.S. as Amicus Curiae in Support of Reversal, *NML Capital, Ltd. v. Banco Central de la Republica Argentina*, No. 10-1487, at 12 (2d Cir. filed November 30, 2010) (Docket #276) ("[T]he protections of the FSIA would be inappropriately diminished if a foreign central bank was routinely required to submit to extensive discovery regarding the uses to which it puts its funds.") (citation omitted); *See* Brief of the U.S. as Amicus Curiae in Support of Affirmance, *Peterson v. Islamic Republic of Iran*, No. 08-17756, at 24 n.5 (9th Cir. filed June 25, 2009) (Docket # 26) ("U.S. court orders permitting private litigants to take discovery from foreign states regarding their worldwide assets, even though those assets are not within the court's execution authority under the FSIA, could cause harm to our foreign relations.") (citation omitted).

[10] *Air Cargo*, a case in which the court ordered the discovery at issue, is distinguishable from this case on other grounds as well: (1) unlike in the present case, the requested discovery in *Air Cargo* was essential to proving liability on the merits; (2) *Air Cargo* involved a conflict between the enforcement of antitrust laws, in which the United States has a very strong interest and a non-substantive foreign blocking statute; and (3) the entity from which discovery was sought in *Air Cargo* was a party to the action, while BNA and the other banks are non-parties.  2010 WL 2976220 at *1-3.

Moreover, in *Minpeco S.A. v. Conticommodity Services, Inc.*, 116 F.R.D. 517, 525-27 (S.D.N.Y. 1987), the court considered the status of the entity resisting discovery , *i.e.*, whether or not it is a party to the litigation, and found that the balance of the relevant factors weighed *against* compelling disclosure of information that was protected by Swiss bank secrecy laws, even where "neither side has provided helpful information regarding frequency of enforcement and punishments under [Swiss law]. . . ."

Because BNA is a non-party that would face a real risk of prosecution and liability, including criminal liability, if it were to produce banking documents maintained in the foreign jurisdictions, the hardship of compliance factor weighs squarely in its favor.

After weighing all factors, the scale tips in favor of BNA and therefore Plaintiffs' motion to compel BNA to produce documents from the foreign jurisdictions should be denied.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to compel should be denied and the Republic's motion to quash should be granted.

Dated: New York, New York
      November 7, 2012

Respectfully submitted,

DORSEY & WHITNEY LLP

By: *[signature]*
    Mark S. Sullivan (sullivan.mark@dorsey.com)
    Mario Diaz-Cruz, III (diaz-cruz.mario@dorsey.com)
    Laura M. Lestrade (lestrade.laura@dorsey.com)

51 West 52nd Street
New York, New York 10019
(212) 415-9200

Attorneys for Non-Party
Banco de la Nación Argentina